UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

CIVIL ACTION NO: 5:05CV-043-M

JOHN P. ECKSTEIN and
LOREE ECKSTEIN                                                    PLAINTIFFS

V.

CINCINNATI INSURANCE COMPANY and
GREAT NORTHERN INSURANCE COMPANY,
a subsidiary of THE CHUBB CORPORATION                    DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on a motion by Great Northern Insurance Company

[DN 43] for summary judgment.  Fully briefed, this matter stands ripe for decision.  For the

following reasons, Great Northern's Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

The Ecksteins, a husband and wife, bring this action against Defendants, Cincinnati

Insurance Company ("CIC") and Great Northern Insurance Company ("Great Northern"),

a subsidiary of the Chubb Corporation ("Chubb"), in an attempt to recover on some or all of

the insurance policies that they had taken out on their home.  It is not disputed that their

home experienced water damage due to a variety of construction related issues, which

ultimately resulted in the home becoming contaminated with toxicgenic mold.  The

toxicgenic mold rendered the home uninhabitable and forced the Ecksteins to live in

temporary housing for nearly two years.

-1-

Construction first began on the Ecksteins' home in the Fall of 1998. On November 11, 1998, CIC issued Builders' Risk Policy CA 542 33 43 to the Ecksteins. This Policy was amended twice and remained in effect until July 11, 2000. By May of 2000, A&K Construction ("A&K") completed construction of the Ecksteins' home. The Ecksteins then moved into their home and became aware of leaks in their residence shortly thereafter. Great Northern issued Policy 11937190-01 to the Ecksteins for the period of June 6, 2000 to June 6, 2001. Great Northern then issued a second policy, Policy 11937190-02 to the Ecksteins on June 6, 2001. That Policy was cancelled effective December 1, 2002. On that date, CIC issued a policy numbered HR 8305747 to the Ecksteins. The policy period for CIC Policy HR 8305747 was from December 1, 2002 until December 1, 2005. In sum, CIC and Great Northern issued a total of four separate insurance policies to the Ecksteins.

On May 31, 2003, the Ecksteins vacated their home. Shortly thereafter, they filed suit in McCracken Circuit Court naming A&K, Ken Hunt, the President of A&K, and CIC, among others, as Defendants. Great Northern was not a party to the state court litigation. That litigation has been resolved as Ken Hunt repurchased the home from the Ecksteins for $1.4 million, and the Ecksteins received an additional $3.6 million in settlement of their claims. On January 31, 2005, the Ecksteins filed this action against Great Northern and CIC.

Beginning in June of 2003, the Ecksteins employed Dr. Kim E. Anderson, an expert in the field of mold toxicology, to perform an independent evaluation and assessment into the causation of water intrusion and subsequent damage to the home. Dr. Anderson made a number of visits to the home and determined that a total of five separate leaks had caused

significant structural damage to the house.  He testified that each of the leaks had a different causal explanation.  Although Dr. Anderson concluded that four of the leaks were generally caused by defective construction, he could not identify the cause of the leak to the playroom.

Dr. Anderson also observed,

> [T]his is not the typical mold case, where small amounts of water repeatedly saturate cellulose based materials and eventually cause fungi, mold or bacteria, and most of the damage is caused by the fungi, mold or bacteria.  Here, there was a lot of fungi, mold and bacteria discovered and the levels were high in the house, but most of the damage was caused by the fact that the house took on massive amounts of water.  Although many of the water damaged walls ultimately developed fungi, mold or bacteria, the water damage itself which preceded the fungi, mold or bacteria in most cases warranted the walls' complete replacement.  In fact, it was for this reason that we recommended tearing down significant portions of the house instead of attempting a remediation of the fungi, mold or bacteria that was present.  This was because the water damage had already destroyed the walls and related structures....A large portion of the damage from the water in location was immediate and severe, necessitating massive repairs, but the immediacy of the damage was not initially discovered due to the nature and location of the damages...Although portions of the Eckstein residence were damaged by fungi, bacteria or mold, those were the very last symptoms, or results, of the damage caused by the water damage.  Very few areas of the structure that were damaged by fungi, bacteria and mold had not already been damaged beyond repair months or years earlier (depending upon the location) by the water damage that occurred at the property.

As to the issue of timing of discovery of the leaks, Dr. Anderson remarked,

> There was a delay in the discovery of the problem by the Ecksteins, but this should not be confused with gradual decay.  The delay was caused by the fact that the plastic house wrap's 'baggie' effect tended to conceal a very significant condition until the plastic house wrap itself failed on the inside, or the brick veneer system failed on the outside.  We literally found standing water inside...some of the walls of the house in areas where the plastic house wrap and veneer had not yet been punctured or damaged.  I have seen a number of mold damaged residences where the mold developed from gradual decay over a number of years.  The damage here was markedly different.

Mr. Eckstein submitted an affidavit in the state court case in which he testified that an initial leak occurred in the Breakfast Room, shortly after the Ecksteins had moved into their new home in 2000.  Mr. Eckstein reported the leak to Mr. Hunt, and the leak was repaired.  The Ecksteins claim that they never again saw visible water leaks in the breakfast room, and Dr. Anderson also testified that the Breakfast Room leak never showed any visual symptoms.  On the contrary, the Ecksteins claim that they first discovered the significant leaks in April of 2003.  At that point, A&K removed large sections of water damaged drywall, which exposed the existence of black mold and severe inner wall leaks.  In May of 2003, the Ecksteins moved out of their home for several weeks.  In June of 2003, CIC hired the Rimkus Consulting Group ("Rimkus") to investigate the presence of mold in the home and to provide an engineering analysis of the problems.  Rimkus discovered a second, very severe inner wall leak in the breakfast room.  The Ecksteins claim that they had no knowledge of that leak prior to its discovery by Rimkus.  The author of the Rimkus report, Patricia Farcas ("Farcas") testified that mold had been present for a month or two at the time when she saw the mold in mid-June of 2003.  She also testified that it would be impossible to determine whether the mold had been present for more than two months.

The Ecksteins further assert that it was not until after Rimkus evaluated the home that they became aware of any of the causes of the water leaks.  As to whether the Ecksteins should have been aware of the leaks before this date, Jay Karls, a Ph.D. engineer who evaluated the residence and who serves as the Ecksteins' expert in this action, opined,

It is highly doubtful that any normal homeowner of limited construction experience would know how to properly waterproof and flash a brick veneer system, construct or space weep holes, construct and flash a rubber membrane roof, or ventilate a crawlspace. The Ecksteins' merely seeing water on the surface of the drywall of an interior room would not be sufficient to put a normal homeowner of reasonable diligence on notice of the types of inner wall problems and code violations which exist at the residence. In fact, those are the types of problems that could easily be logically explained (by a homeowner) as resulting from minor water leaks, or minor problems associated with new construction.

In 2003, the Ecksteins tendered a claim to Great Northern for their damages. The parties tell different stories as to how Great Northern responded to the claim. By affidavit, one of the Ecksteins' attorney, Scott Halloin ("Mr. Halloin"), testifies that Chubb sent a letter to the Ecksteins acknowledging the claim but did not issue a reservation of rights letter. Shortly thereafter, Great Northern retained a mold testing service, Environmental Safety Technologies ("ESTech"), and an engineering firm, Donan Engineering Co. ("Donan"), to evaluate the Ecksteins' claim. Mr. Halloin alleges that Great Northern did not respond to information inquiries by the Ecksteins' legal counsel until December 18, 2004, at which point Great Northern provided the Ecksteins' legal counsel with copies of the Donan and ESTech reports. The Ecksteins then filed this claim on January 31, 2005. Mr. Halloin contends that Great Northern did not take a formal position on the Ecksteins' claim until this Motion for Summary Judgment, filed on May 5, 2006.

Great Northern describes the events quite differently. On June 27, 2003, Great Northern sent the Ecksteins a letter acknowledging the claim, which stated,

At this time, we do not have sufficient information to enable us to determine whether or not coverage is afforded under the above policy numbers for the

claim submitted.  As further information and documentation is received we will review same and determine the extent of coverage available under the policy(s) in question.  If it should be determined that there is no coverage available under the policy(s) for the damage being claimed, the Great Northern Insurance Company reserves its rights in that coverage may be denied at that time.  If it should be determined that there is coverage we will proceed with the adjustment of the claim.  By taking the above action Great Northern Insurance Company does not waive its rights to any other defenses under the policy(s) should additional information be obtained.

Great Northern also submits the affidavit of Dan Dugan ("Mr. Dugan"), the original Great Northern Adjuster handling the case, with attached correspondence between Mr. Dugan and Mr. Halloin.  The record shows that Mr. Dugan asked for an update on the claim on several different occasions during November of 2003 and January of 2004.  On March 24, 2004, Mr. Dugan sent Mr. Halloin a letter in which he stated that "[i]f we have not heard from you within the next thirty days, we will assume that the Eckstein's no longer wish to submit a claim for damage and we will close our file accordingly."  Mr. Halloin did not respond to this letter, so Mr. Dugan sent another letter via certified mail to the same effect on April 30, 2004.  Plaintiffs' other counsel, Bobby Miller ("Mr. Miller") responded on May 3, 2004, asking that Great Northern reimburse the Ecksteins for their losses.  On May 12, 2004, Mr. Halloin responded to Mr. Dugan's letter and noted that there was a mix up in correspondence.

Thereafter, the Plaintiffs' claim was reassigned from Mr. Dugan to Walt Geil ("Mr. Geil").  On November 5, 2004, Mr. Geil wrote Mr. Miller and asked him to forward any documentation which would support Plaintiffs' claim for damages.  On December 15, 2004, Mr. Geil wrote Mr. Miller to notify him both that Great Northern was in the process of reviewing the Donan and ESTech reports and that it was in the process of making plans to

inspect the Ecksteins' home. The Ecksteins subsequently filed suit in this case on January 31, 2005.[1]

In their Complaint, the Ecksteins bring claims against Great Northern for breach of contract, bad faith, and violation of the Consumer Protection Act.[2] The parties previously filed motions as to the applicability of trigger theories under insurance law. Noting that Kentucky had not adopted a particular trigger theory, the Court likewise declined to adopt one and concluded that it would consider each policy on its terms. Great Northern now files this motion for summary judgment.

## II. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories, and affidavits, establish that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific

---

[1]Mr. Halloin states in his affidavit that Great Northern has not made its initial disclosures in this case. However, Great Northern's initial disclosures were filed on January 31, 2006 and are reflected as [DN 39] on the docket sheet.

[2]Plaintiffs' Complaint states a claim for Violation of the Consumer Protection Act, KRS 367.110 *et seq*, though neither party addresses the statute in its motions. To state a claim under that statute, the Plaintiffs would need to show that Great Northern engaged in "unfair (which is construed to mean unconscionable), false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." For the reasons stated in the Section of the opinion entitled "Estoppel Due to Great Northern's Alleged Failure to Timely Respond," the Court finds that summary judgment as to this claim is appropriate.

facts demonstrating a genuine issue of fact for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Co.</u>, 475 U.S. 574, 586 (1986).  The Rule requires the non-moving party to present "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e) (emphasis added).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  <u>Anderson</u>, 477 U.S. at 252.[3]

## III. DISCUSSION

In its motion for summary judgment, Great Northern argues that its policies exclude all coverage for Plaintiffs' damages.  Specifically, Great Northern points to two exclusions, one for Faulty Planning, Construction or Maintenance and one for Gradual or Sudden Loss.  Plaintiffs contend that each exclusion contains an exception for ensuing losses, and that the exceptions allow for coverage in this case.  Plaintiffs also argue that Great Northern acted in bad faith in handling this claim and should be estopped for even raising the exclusions.  Great Northern, in its reply, argues that it responded to the Plaintiffs in a timely and appropriate fashion.  It also contends that the doctrines of judicial estoppel and collateral

---

[3]The Court is to apply Kentucky law in this diversity case.  <u>Republic/NFR & C Parking v. Reg'l Airport Auth.</u>, 410 F.3d 888, 891 (6th Cir. 2005).

estoppel bar the Plaintiffs' claims in light of the state court litigation.  The Court will begin by addressing the issues of judicial estoppel and collateral estoppel before turning to whether Great Northern is estopped from raising the exclusions in its Policies.  The Court will conclude by discussing the specific exclusions and exceptions in the Policies.

**A. Judicial Estoppel**

Great Northern argues in their reply that the doctrine of judicial estoppel is applicable because the Plaintiffs altered their theory of causation in this litigation from their position advanced before the McCracken Circuit Court.  In that court, the Plaintiffs argued that all of their losses and all of the mold resulted from faulty construction of the home.  Here, the Plaintiffs technically seek recovery not because of the faulty construction but rather due to the water infiltration which was made possible by the faulty construction.

The doctrine of judicial estoppel prohibits a party from asserting a position in a legal proceeding that is contrary to a position successfully taken by the party in some earlier legal proceeding.  Reynolds v. Commissioner, 861 F.2d 469, 472 (6th Cir. 1988).  The application of judicial estoppel is controlled by federal law.  Allen v. Zurich Ins. Co., 667 F.2d 1162, 1167 n.4 (4th Cir. 1982).  It is also within the court's sound discretion. Matter of Cassidy, 892 F.2d 637, 642 (7th Cir. 1990).  "The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." Reynolds, 861 F.2d at 472.  Because the doctrine "is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion." Russell v. Rolfs, 893

F.2d 1033, 1037 (9th Cir. 1990). Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one. Id.

"Judicial estoppel is an extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3d Cir. 1996)(internal quotation omitted). It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts. Id.

In Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005), the Tenth Circuit reviewed factors typically used to determine when to apply judicial estoppel:

> First, a party's later position must be 'clearly inconsistent' with its earlier position." Id. (citation omitted). Moreover, the position to be estopped must generally be one of fact rather than of law or legal theory. Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996). Second, "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.'" New Hampshire, 532 U.S. at 750, 121 S. Ct. 1808 (citation omitted). The requirement that a previous court has accepted the prior inconsistent factual position "ensures that judicial estoppel is applied in the narrowest of circumstances." Lowery, 92 F.3d at 224. Third, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." New Hampshire, 532 U.S. at 751, 121 S. Ct. 1808.

The Court does not view Plaintiffs' position as clearly inconsistent with its position in state court. In the Plaintiffs' Response brief they state that "faulty construction of [their]

House allowed water to infiltrate the property." Paragraph 52 of the Ecksteins' Complaint in state court alleged that the house sustained water damage from defective construction. In other words, the Ecksteins acknowledged that faulty construction was the baseline problem. Their argument here is simply that events occurred after the faulty construction which arguably provide an exception to the "faulty construction" exclusion. This is not an inconsistent position to that taken in state court.

### B. Collateral Estoppel

Great Northern also argues that collateral estoppel applies. Collateral estoppel bars a party from re-litigating any issue actually litigated and finally decided in an earlier action. Buis v. Elliott, 142 S.W.3d 137, 140 (Ky. 2004). The Kentucky Supreme Court in Moore v. Cabinet for Human Res., 954 S.W.2d 317, 319 (Ky. 1997) listed the essential elements of collateral estoppel as follows: (1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with the estopped party given a full and fair opportunity to litigate; (4) a prior losing litigant.

The issues in the McCracken Circuit Court case and the case before the Court are not identical. Great Northern was not a party to the state court litigation. The issue here is whether Great Northern is obligated to pay the Ecksteins' claim under the two Policies at issue. Although certain issues overlap in the two cases, the state court did not have occasion to address whether Great Northern's Policies provide coverage. Thus, there is no identity of issues, and collateral estoppel is not applicable to the instant action.

### C. The Policies

Both policies contained the same exclusions with regard to real and personal property damage coverage.  The term occurrence is defined in the policies as, "a loss or accident to which this insurance applies occurring within the policy period.  Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence."  The policies then identified the following exclusions:

> Gradual or sudden loss.  We do not cover any loss caused by wear and tear, gradual deterioration, rust, fungi, mold, corrosion, dry or wet rot, warping, insects or vermin.  We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

> Faulty planning, construction, or maintenance.  We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance.  It does not matter whether the faulty acts, errors or omissions take place on or off the insured property.  But we do insure ensuing covered loss unless another exclusion applies.  "Planning" includes zoning, placing, surveying, designing, compacting, setting, specifications, developing property and establishing building codes or construction standards.  "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.

Having set forth the terms of the policies, the Court will now address the remaining issues.

### 1. Estoppel Due to Great Northern's Alleged Failure to Timely Respond

Plaintiffs argue that Great Northern has waived any defenses to coverage due to its delay in responding to Plaintiffs' claim under the policies.  Under Kentucky law, "[a] contract of insurance cannot be created or enlarged by estoppel or waiver."  Old Republic Insurance Co. v. Begley, 314 S.W.2d 552, 557 (Ky. 1958).  In other words, the "conduct or actions of the insurer...is not applicable to matters of coverage."  Old Republic Ins. Co. v. Am. Guar. & Liab. Ins. Co., No. 3:04CV-416-S, 2005 U.S. Dist. LEXIS 9616, at *5

(W.D.Ky. May 19, 2005).  Moreover, there is evidence that Great Northern timely responded to this claim.

### 2. Bad Faith

Plaintiffs have also alleged that Great Northern violated KRS 304.12-230 by engaging in unfair claims settlement practices.  An insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.  Wittmer v. Jones, 864 S.W.2d 885, 890 (Ky. 1993).

The issue of whether Plaintiffs can make out a bad faith claim is a jury question.  At this stage, the Court cannot say as a matter of law whether Great Northern lacked a reasonable basis in law or fact for denying the claim or whether Great Northern either knew there was no reasonable basis for denying the claim or whether it acted with reckless disregard for whether such a basis existed.

### 3. Ensuing Loss Exception

Before addressing the specific arguments and interpretations made by the parties as to what items are covered by the policies, the court first notes that Kentucky law governs the interpretation of the insurance contracts at issue.  "Interpretation of an insurance policy is a question of law" that the Court reviews de novo.  K.M.R. v. Foremost Ins. Group, 171

S.W.3d 751, 753 (Ky. App. 2005). In undertaking review, the Court must keep in mind that a "contract should be liberally construed" and that all doubts must be "resolved in favor of the insureds." Id. Also, all "exceptions and exclusions should be strictly construed" for the efficacy of insurance. Id. "Under the 'doctrine of reasonable expectations,' an insured is entitled to all the coverage he may reasonably expect to be provided according to the terms of the policy." Hendrix v. Fireman's Fund Ins. Co., 823 S.W.2d 937, 938 (Ky. Ct. App. 1991).

As to the terms of the policies, both provide that physical losses are covered unless excluded. Both policies then specifically exclude mold and construction defects. However, the policies do cover "resulting" or "ensuing" losses from excluded losses. Though the policies contain a provision for "resulting" or "ensuing" losses, the policies do not define those terms. "The words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning." Nationwide Mut. Ins. Co. v. Nolan, 10 S.W.3d 129, 131 (Ky. 1999). Dictionary.Reference.com defines ensuing as "to follow as a consequence or result" or "to take place subsequently." Courts have defined an ensuing loss as "a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a chance, likely, or necessary consequence of the loss caused by faulty workmanship or faulty materials." Atlantic Mut. Ins. Cos. v. Lotz, 384 F. Supp. 2d 1292, 1305 (E.D. Wis. 2005). The parties have cited several cases which explore the application of the term ensuing loss, however, neither has located a Kentucky case which addresses the concept of ensuing loss in this context.

Plaintiffs' argument pursuant to the terms of the policies is that exceptions providing for coverage in the event of an ensuing loss allow for coverage on these facts. The parties do not dispute that the policies initially provide coverage for this claim under their "occurrence" language. The parties also do not dispute that the Policies contain two exclusions, a "Gradual or Sudden Loss" exclusion and a "Faulty Planning, Construction or Maintenance exclusion." The only issue is whether the exceptions to the exclusions, which provide coverage in the event of an ensuing loss, are applicable. The Plaintiffs contend that the major damage in this case is water damage, and, that such damage is an ensuing loss from the faulty construction and, thus, covered by the Policies.

The Court finds that case law and the dictionary definition of ensue supports the Plaintiffs' argument. There is nothing in the policies to indicate that an ensuing loss must be the result of a separate cause from the excluded loss. To the contrary, the policies are clear that faulty construction losses are excluded, but losses taking place afterward, or as a result of faulty construction, are covered. The exclusions still apply despite the applicability of the ensuing loss provision. For example, water damage ensuing from a defective roof is covered as an ensuing loss, but the exclusion for faulty construction excludes coverage to repair the roof. Such an interpretation is consistent with the reasonable expectations of the insureds.

Here, the Plaintiffs have proffered an expert, Dr. Anderson, who will testify that substantially all of the damages claimed by the Ecksteins are the result of water which infiltrated the house due to faulty construction. Under the circumstances of this case, damage

from water infiltration is a loss ensuing from the excluded faulty construction and thus, is covered under the policies.

Water can damage a structure in a variety of ways.  Typically, water causes damage to a structure by way of rot, decay, mold, and deterioration.  CIC argues that the damage is not covered because rot, decay, mold and the like are specifically excluded under the policies.  The Court adopts the rationale of the cases cited by the Plaintiffs which hold that rot and mold is not excluded when it is the result of an otherwise covered event.  As the Texas Court of Appeals stated in Home Insurance Company v. McClain, No. 05-97-01479-CV, 2000 WL 144115, at *4 (Tex.App.-Dallas Feb. 10, 2000), "the loss that followed the water damage was caused by water damage."  It was not caused by mold damage.  The policies  here exclude loss **caused by** mold, rot, decay, etc.  The policies do not exclude loss which **is** mold, rot, decay and the like.  The mold exclusion would preclude coverage for mold occurring naturally or resulting from a non-covered event.  But when mold ensues from water damage which is covered under the policy, the mold damage is covered despite the exclusion. Flores v. Allstate Texas Lloyd's Company, 278 F.Supp.2d 810 (S.D. Tex. 2003).  This interpretation is consistent with the doctrine of reasonable expectations. An insured would reasonably expect that if a pipe bursts and floods his home with water, damaging walls, ceilings, carpets, floors, and sub-floors, that there is insurance coverage to repair the damage but there is no coverage to fix the corroded pipe.  The ensuing loss is covered despite the fact that the water caused the walls and ceilings  to "decay" and "deteriorate" and the carpets and floors to "rot" and "mold."  The decay, rot, deterioration,

-16-

and mold did not cause any of the damage and thus, the damage is not excluded.  This case is no different.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [DN 43] is **DENIED**.

cc: counsel of record
05cv-043Eckstein(2)